LLOYD E. MILLIKAN v. GUILFORD MILLS, INC., RANSONE & SON PLUMB-
ING, INC., DAVID C. MURRAY, INDIVIDUALLY AND T/A MURRAY CRANE
SERVICE AND ROBERT H. RANSONE, INDIVIDUALLY AND T/A AND D/B/A RAN-
SONE & SON PLUMBING

No. 8318SC1077

(Filed 16 October 1984)

**1. Negligence § 30— evidence insufficient—directed verdict for defendant proper**
    Although plaintiff's evidence tended to show that plaintiff was injured
because one of the hooking rings by which a pump assembly was being lifted
failed, directed verdict was correctly entered for defendants because plaintiff's
evidence did not show that anyone was negligent in using the hooking rings to
lift the assembly.

**2. Evidence § 15— instruction manual—relevant—no prejudice from exclusion**
    In an action for negligence resulting from a pump assembly falling on
plaintiff, there was no prejudice from the exclusion of the pump manufactur-
er's instruction manual because it contained no information about lifting the
motor, the pump, or assembly, or about the purpose of the hooking rings.

**3. Evidence § 33.2— hearsay—answers to interrogatories by third party—inad-
missible**
    A third party's sworn answers to interrogatories were inadmissible as
hearsay and were properly excluded.

APPEAL by plaintiff from *Morgan, Judge.* Judgment entered
25 February 1983 in Superior Court, GUILFORD County. Heard in
the Court of Appeals 21 August 1984.

Plaintiff sued the several defendants for damages allegedly
sustained due to their negligence when a sump pump and motor
weighing more than 800 pounds, which was being lifted by a
crane, fell on and injured him. Before trial plaintiff's claims
against the manufacturer and distributor of the sump pump,
Crane Company and Kester Machinery Company, were dismissed
by summary judgment, as was the third party claim of a defend-
ant against Gould, Inc., the manufacturer of the electric motor,

and none of these parties are interested in this appeal. At trial the claims against the other defendants, Guilford Mills, Inc., which owned the pump assembly and the premises it was situated upon, Robert H. Ransone, individually and doing business as Ransone & Son Plumbing, who installed the pump earlier and participated in its removal, and David C. Murray, individually and trading as Murray Crane Service, who operated and furnished the crane involved, were dismissed by a directed verdict at the close of plaintiff's evidence.

*Benjamin D. Haines for plaintiff appellant.*

*Nichols, Caffrey, Hill, Evans & Murrelle, by G. Marlin Evans, for defendant appellee Guilford Mills, Inc.*

*Tuggle, Duggins, Meschan & Elrod, by Joseph F. Brotherton, for defendant appellee Robert H. Ransone, Individually and t/a and d/b/a Ransone & Son Plumbing.*

*Henson & Henson, by Perry C. Henson and Jack B. Bayliss, Jr., for defendant appellee David C. Murray, Individually and t/a Murray Crane Service.*

PHILLIPS, Judge.

The central and primary question raised by this appeal is whether the evidence presented by plaintiff at trial made out a case of negligence against any of the defendants that were still in the case. The evidence, viewed in its most favorable light for the plaintiff, was to the following effect:

During the spring of 1978 plaintiff was superintendent of construction for JMD Contractors, which concern was constructing some sludge drying beds for the defendant Guilford Mills, Inc. at its facility in Duplin County near Kenansville. That project included the installation of two sump pump assemblies, each consisting of a pump that weighed 680 pounds and a motor that weighed 125 pounds, which had been delivered to Guilford Mills, the purchaser, unassembled. Each motor had two hooking rings on it, one on each side; each ring was about 6 inches long in its hooked shape, about ½ inch wide, ½ inch thick, and was affixed to the motor with two bolts or screws. The installation of the pumps into pits prepared for that purpose was subcontracted to the de-

fendant Ransone, a plumbing contractor. In April 1978, Ransone took the pumps and motors out of their crates, carried them to the site, and with the aid of a backhoe lowered them into the pits, where the motors were attached to the pumps. In June 1978, because of some unusual noise and vibration in one of the sump pump assemblies, Guilford Mills' project engineer asked defendant Ransone to remove the assembly from its pit so that it could be inspected, and arranged for defendant Murray Crane Service to provide a crane and crane operator to do the necessary lifting. On 6 June 1978, plaintiff, who did not know of the problem and had no responsibilities in connection with it, saw the crane in position near the sump pump pits and saw Ransone hook the choker cable of the crane to the two hooking rings on the side of the motor and place it into the big hook at the end of the cable. Since Ransone had no one assisting him, plaintiff went forward to help as needed. As the pump was being lifted out of the pit defendant Ransone and plaintiff Millikan were sort of steering the impeller and letting it slide through their hands, not putting any pressure on it or anything like that, but just guiding it through the opening. During the lift, Ransone gave hand signals to the crane operator, whose seat in the cab was at least twelve feet from the pump. At all times when plaintiff saw him the crane operator was in the cab of the crane. When the pump assembly had been lifted several feet into the air, one of the metal hooking rings straightened out and the pump fell and struck plaintiff.

Before the lifting operations began Ransone made no inquiry of Guilford Mills or anyone else as to the weight or dimensions of the pump and motor, or the existence of a manufacturer's instruction manual, and did not disengage the coupling between the motor and the shaft and did not remove the motor from the frame. He did not give the lifting operation a whole lot of thought, since he did not feel that it was his responsibility, but he did regard any lifting by a crane as a potentially hazardous operation. He never paid any attention to or considered the weight of the entire pump assembly at any time, and did not inquire about an instruction manual because he didn't think he needed one. Because of his prior experience in selling and installing pumps as a licensed plumber, Ransone did not feel that he needed any instructions in connection with the assembly, installation, or removal of the pump. He identified Plaintiff's Exhibit 1 as being a manufactur-

er's instruction manual for the assembly involved. He had seen and was familiar with similar manuals. Before the lifting began Ransone had no discussion with the crane operator because he felt that his only responsibility was to repair the pump and that others were responsible for lifting it; but he admitted that neither plaintiff nor anyone else gave him any instructions during the lifting process. He did not know that the purpose of the hooking rings on the side of the motor was to lift the motor only, and assumed that the cables attached to the crane would lift the entire pump assembly by the use of the hooking rings on the motor. He thought the hooking rings were for lifting the entire pump assembly, but stated prudence would probably require that you find this out before beginning the lifting. He did not use a sling or spreader bar to help lift the pump mechanism out of the pit, and had never used a spreader or lifting bar in any lifting operations he had been involved in as a plumber. The pump was the largest one Ransone had ever been involved with, either installing, disassembling, or removing. Neither the crane operator nor the crane company knew the weight of the pump and motor that was going to be lifted or made any inquiry about it, and neither had lifted or raised a pump of that type before.

From the foregoing evidence it is readily inferable that what caused the sump pump assembly to fall on plaintiff was the straightening out of one of the two hooking rings that the entire assembly was being lifted by. Other questions remain, however. One is what caused the hooking ring to fail? Plaintiff argues, perhaps correctly, that common sense inevitably leads to the conclusion that the hooking ring failed because the 805 pound pump assembly was simply too heavy for it. Even so, was this because of the weakness of that particular ring—the other ring did not bend or straighten—or because such rings were not supposed to be used in lifting the entire assembly? The evidence presented gives us no answer. But assuming arguendo, as plaintiff contends, that rings of that type can be expected to fail when used to lift an 800 pound weight, did Ransone or any other defendant know, or should any of them have known, that? Plaintiff strongly argues that this should have been known, because the rings "were designed only to lift the pump motor which weighed 125 pounds." But the evidence does not show that. No one testified that the rings were designed to lift only the motor; or that it is customary

or proper to lift such assemblies by some other means; or that hooks of the size and substance involved were not strong enough to support both the 125 pound motor and the 680 pound sump pump assembly. That the hooks involved were situated on the lighter motor, rather than on the much heavier pump, is not enough by itself, in our opinion, to prove that they were not designed to be used in lifting the entire assembly. For the two units to function they had to be joined together and after being put in operation before they could be inspected or repaired in certain respects they had to be moved from the pit in which they were installed. It cannot just be assumed that there were better and safer ways of lifting the unified assembly which should have been used or that the units should have been separated before they were lifted. Nor, in our opinion, can negligence in lifting the assembly by the rings with a crane be inferred from the fact that the units were separate when Ransone installed the heavy pump with the aid of a backhoe and installed the lighter motor manually. From aught that the evidence shows removing the sump pump assembly could have required procedures and equipment different from those used in installing it. The evidence does tend to show, we believe, that Ransone was negligent in using the hooking rings to lift the entire assembly without first verifying that was what they were designed for. He admitted that he did not know that the rings were designed for that purpose, only assumed that they were, and that it was imprudent on his part not to find out before beginning the lift; and imprudent conduct is some evidence of negligence. But the evidence also fails to show what Ransone would have learned if he had investigated the matter; so the proximate connection between his imprudence or negligence and the straightening of the hook and plaintiff's injury was not established.

[1] Rarely is it proper to direct a verdict against a plaintiff in a negligence case. *Alva v. Cloninger*, 51 N.C. App. 602, 277 S.E. 2d 535 (1981). This is because of the favorable view that must be taken of the plaintiff's evidence in such cases, the prerogative that juries have in all cases to believe all, none, or some of the evidence presented to them, and what is reasonably prudent conduct under varying circumstances is nearly always a question of fact, rather than law. Thus, to survive a motion for directed verdict in such a case, the plaintiff's evidence tending to show a

defendant's negligence does not have to be either strong, convincing, consistent, or even credible to anyone except the jury; it is enough if the evidence favorable to plaintiff, when pieced together, is sufficient, along with the inferences reasonably drawable therefrom, to warrant finding that plaintiff was injured as a proximate result of the defendant's negligence. Thus, under our law, close cases, dubious cases, questionable cases, and even weak cases are still cases for the jury; but cases in which the evidence fails to establish one or more of their essential elements are not. Quite clearly, we think, plaintiff's evidence, even when viewed as indulgently as the law permits, is not sufficient to warrant the conclusion that he was injured as a result of the negligence of any of the defendants. Though the evidence does tend to show that plaintiff was injured because one of the hooking rings that the 805 pound assembly was being lifted by failed, it does not tend to show that using the hooking rings to lift the assembly was negligence on the part of anyone. Since the plaintiff's evidence is clearly deficient in this essential respect, the directed verdict in favor of all the defendant appellees was correctly entered. Under the circumstances, the contentions of the defendants Guilford Mills and Murray Crane Service that plaintiff's evidence also failed to show that either of them was responsible, either directly or indirectly, for the assembly being lifted by the rings need not be considered. One basis for dismissing an action is enough.

[2]   Plaintiff also contends that the court erred to his prejudice by refusing to receive into evidence the pump assembly manufacturer's instruction manual, which plaintiff offered against Guilford Mills and Ransone. The basis for refusing this evidence, apparently, was that the manual was a private publication not having the force of law. *Sloan v. Carolina Power and Light Co.*, 248 N.C. 125, 102 S.E. 2d 822 (1958). But the manual was not offered as a legal code binding upon the parties; it was offered, apparently, simply as some evidence as to how such assemblies are customarily handled. The use of and reliance upon instruction manuals for machines, devices and equipment of all kinds is so nearly universal and well known that courts should receive such materials into evidence as a matter of course in appropriate cases. It is a matter of common knowledge that there is hardly a machine, device, or piece of equipment sold in this country that is not accompanied by an instruction manual, sheet, or label of some kind. The publica-

tion and distribution of such information is encouraged, if not required, by innumerable government agencies, consumer groups and industry associations; and the failure of manufacturers and distributors to properly inform purchasers and other users of a product's hazards, uses, and misuses is a basis for rendering them legally liable for injuries resulting therefrom under some circumstances. 72 C.J.S. Supp. *Products Liability* § 29 (1975). That people who acquire or use such machines and devices usually read and follow the accompanying information is also a matter of common knowledge, confirmed by the rule of law which declares that the failure to do so is evidence of contributory negligence under some circumstances. W. Prosser, Law of Torts, § 102 (4th ed. 1971). That such manuals are usually reliable is generally known, and when relevant and material should be received, we think, as some evidence of what is customarily done by users of such products. 1 Brandis N.C. Evidence § 165 (1982). But the court's refusal to receive the manual involved here did plaintiff no prejudice, because it contains no information about lifting the motor, the pump, or assembly, or the purpose of the hooking rings. Thus, even if it had been received into evidence, the critical gaps in plaintiff's case would still be there.

[3] But some material information about lifting electrical motors and their assemblies was contained in some other material that plaintiff unsuccessfully offered into evidence. The offering consisted of some interrogatories that plaintiff served on Gould, Inc., the manufacturer of the electric motor, when that third party defendant was still in the case, Gould's sworn answers thereto, and a pamphlet issued by the National Electrical Manufacturers Association that was attached as an exhibit. The court's refusal to receive this material into evidence was proper. Even if Gould had still been in the case its *ex parte* statements would not have been admissible against the defendants. *Barclays American Financial, Inc. v. Haywood*, 65 N.C. App. 387, 308 S.E. 2d 921 (1983). If the officer of Gould that signed the answers had undertaken to testify to the same effect, the question presented would be different; but he was not present, and with regard to the defendant appellees his out of court statements were but inadmissible hearsay.

Affirmed.

Judges WEBB and JOHNSON concur.